**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **JACOB DEKOKER, INDIVIDUALLY** | § | |
| **AND ON BEHALF OF JDJS AUTO** | § | |
| **CENTER, INC. D/B/A** | § | |
| **TYLER MITSUBISHI** | § | |
| | § | |
| **PLAINTIFF** | § | |
| | § | **CIVIL ACTION NO.6:11-cv-00147** |
| **vs.** | § | |
| | § | |
| **JAMES T. STONE AND** | § | |
| **TEXANA BANK, N.A.** | § | |
| | § | |
| | § | |
| **DEFENDANT** | § | **Jury Trial Requested** |

<u>**PLAINTIFF'S FIRST AMENDED COMPLAINT**</u>

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Jacob DeKoker, individually and on behalf of JDJS Auto Center, Inc. d/b/a Tyler Mitsubishi ("JDJS"), Plaintiff herein, and files this First Amended Complaint against Defendants, James T. Stone (" Stone") and Texana Bank, N.A. ("Texana").  In support of this cause, Plaintiff would respectfully show the Court as follows:

### I. Parties

1.      Plaintiff, Jacob DeKoker, is an individual who resides in Fort Worth, Tarrant County, Texas.  Plaintiff JDJS Auto Center, Inc. d/b/a Tyler Mitsubishi, is a corporation formed under the laws of the State of Texas with its principal place of business in the Eastern District of Texas.

2.      Defendant, James T. Stone, is a citizen and resident of the Eastern District of Texas and may be served with process at 103 Sweetwater Trail, Longview, Tx 75605-7564.

3.      Defendant, Texana Bank, N.A. is a Texas state financial institution which may be served with process by serving its registered agent, John R. Roundtree,111 E. Rush, Linden, Tx 75563.

### II. Jurisdiction

4.      Jurisdiction over Plaintiff's constitution claims for which redress is provided by 42

---

U.S.C. §1983 is conferred on this Court by 28 U.S.C. § 1331 because this action arises under 18 USC §1961 et. seq., commonly referred to as RICO causes of action.

5.      Venue is proper in the Tyler Division of the Eastern District of Texas in that all or a significant portion of Plaintiff's claims and/or causes of action accrued in the Eastern District of Texas pursuant to 28 U.S.C. §1391(a).  Specifically, the contract for bank account was entered into in Gregg County, Texas and the Defendants are all located in the Eastern District of Texas.

### III. Facts

6.      Jake DeKoker ("DeKoker") and Stone entered into a business relationship to purchase an automobile  dealership in Tyler, Texas.  To this end, they formed  JDJS Auto Center, Inc. d/b/a Tyler Mitsubishi (hereinafter referred to as "JDJS").  Over the course of the following years, Stone, acting in conspiracy with Texana, and with the help of Shanna Wilbanks, the office manager for the dealership, defrauded DeKoker and JDJS of massive amounts of money.

        The following paragraphs describe the many events of fraud, embezzlement, theft and other violations.

7.      **The JDJS agreement.**  As a part of the initial agreement, DeKoker agreed that he would supply used cars to Tyler Mitsubishi.  Additionally, DeKoker was to provide start-up capital. DeKoker initially supplied the dealership with capital to make improvements to the dealership physical plant of approximately $750,000.00.  Stone agreed that he would be responsible to provide $300,000 in initial capital, and be the day to day manager of the dealership.  The ownership and profits were to be split, 70% to DeKoker and 30% to Stone, in accordance with their respective ownership interests in JDJS.

8.      **Texana and Lucas Ponder**.  Initially, Stone approached DeKoker with the idea of opening the dealership.  In this regard, Stone also introduced DeKoker to Lucas Ponder, Director of Texana Bank, N.A.,  and the EVP - Market President of the Longview, Texas  branch.   Stone had a long standing personal relationship with Mr. Ponder.  Stone eventually succeeded in getting DeKoker to agree to allow Texana to be the primary banking lender for the dealership.  On or about May 2, 2007, JDJS opened a commercial  bank account at Texana, account number 900437 (hereinafter referred to as the "Operating Account").

9.       **Stone's failure to provide $300,000 in starting capital.**  Unbeknownst to DeKoker, instead of providing the $300,000.00 in start-up capital to JDJS, Stone obtained a personal loan

from Texana through Mr. Ponder.  The principal amount of the loan was $300,000.00 (hereinafter referred to as the "Texana-Stone loan").  Mr. Ponder, working in concert with Stone, set the Texana-Stone loan up to be paid back from  automatic monthly debits of $3,500.00 per month  from the Operating Account  at Texana.  Unbeknownst to DeKoker, Stone paid back $134,000 of the Texana-Stone loan through these automatic bank debits.  Thus, Stone brought nothing to the business venture.

10.      **The Franklin Bank Account.** On or about February 7, 2008, unbeknownst to DeKoker, Stone and Shanna Wilbanks set up a second bank account in the name of JDJS with the Tyler, Texas branch of Franklin Bank, S.S.B. Stone and Shanna Wilbanks were the only authorized signatories to this account (hereinafter referred to as the " Franklin Bank Account").  The bulk of the funds in the Franklin Bank Account were directly funneled from the Operating Account. Additionally, checks made out to the dealership were diverted into the Franklin Bank Account. The total amount of money funneled into the Franklin Bank Account exceeded $140,000.00. Stone caused money from the Franklin Bank Account to then be directed to other accounts of entities that he controlled, namely Warrstone Investments, L.L.C. (hereinafter referred to as "Warrstone") and Stomaco Energy Services, Inc. (hereinafter referred to as "Stomaco"), an oil and gas company owned by Stone.

11.      **Theft.**  During the time that Mr. Stone was managing the dealership, he stole additional money and inventory in excess of $250,000.00.

12.      **Shanna Wilbanks's Removal From the Signature Cards.**  On February 4, 2010, Shanna Wilbanks was removed from the signature card relating to the Operating Account, and Texana was given express written notification that Shanna Wilbanks had been removed and the bank was not to honor any checks signed by her.  Karen Dameron became the new office manager and Natalie Gilbert was placed on the Operating Account.

13.      Despite the fact that Shanna Wilbanks had been removed from the Operating Account, she managed to sign 25% of the checks after that time.  For example, Shanna Wilbanks signed a check on or about February 23, 2010 for $30,000 from the Operating Account to a company called TSI for oil field equipment used in Stone's separate oilfield business, Stomaco.  Also, Shanna Wilbanks signed a check on March 2, 2010 to Breitling Oil and Gas for $7,000. [Chris Faulkner of Breitling Oil and Gas confirmed that he sold Stone an interest in a gas well after

meeting him on a plane to Las Vegas.]  Upon information and belief, the bank was complicit in honoring the checks drafted by Shanna Wilbanks.

14.      **Stone used the Operating Account as his Personal Piggy Bank.**  Stone also wrote unauthorized checks to himself, to American Express and to Warrstone, out of the Operating Account.  On April 9, 2010, Stone wrote an $8,000 check out of the Operating Account to Lane Auto Sales, owned by Jason Lane, a close personal friend of Stone.  The check is noted by the word "car", but in fact was not a purchase of inventory at all, but instead a ploy to issue a check to Stone.  Additionally, the check was honored by Texana, despite the fact that it had only one signature.  The account agreement for the Operating Account required two signatures.  From July 2009 to June 2010, Stone wrote $24,000 worth of checks to pay his child support obligations; all charged to "employee benefits," with no taxes paid and no 1099 issued.  Stone also used the Operating Account to make five payments on Bridget Stone's car loan from February to May 2009, for a total of $3,982.  In 2009, Stone paid American Express $40,303.84, and in April 2010, he paid an additional $30,000 to American Express out of the Operating Account.  Stone also used the Operating Account to pay his Meadowbrook Country Club dues from July to December 2009, for a total of $1,769.01.   Stone also used the Operating Account to pay his life insurance premiums to National Farm Life for a total of $10,652.50.  On April 19, 2010, Stone wrote a check out of the Operating Account to Warrstone,   his separate real estate company, for $30,000.  Shanna Wilbanks input this check into the Operating Account's check register and recorded it as being written to Texana, not Warrstone.  In addition, Stone used the Operating Account to make an inexplicable payment to "Texana Bank" for $35,000 on June 25, 2010.

15.      **Accounting Manipulation to Cover Up his Embezzlement.**  In another ploy to conceal the draining of assets from JDJS, Stone and Shanna Wilbanks made a series of entries on the last day of each month to make the P&L statements look better.  These deposits were made by Shanna Wilbanks and reversed very shortly thereafter.  The deposits were shown as being made by Warrstone and then later reversed out of the system by Shanna Wilbanks.  This practice of accounting manipulation continued to occur from July 15, 2009 to April 19, 2010.

### IV. Count One - Breach of Contract

16.      Plaintiff hereby incorporates by reference all of the facts that have heretofore been plead.

      **A. Breach of Contract by Stone**

17.     JDJS would show that Stone breached the agreement between Stone and DeKoker by failing to bring $300,000 to the business.  Instead he took out a loan which he charged back to JDJS and paid it back out of the Operating Account.  The Plaintiff tendered full performance under the agreement.  Stone breached the agreement because he failed to perform under the agreement as stated above.  Plaintiff has suffered damages as a result of the breach.  Plaintiff seeks damages resulting from the breach of contract and attorney's fees for this cause of action.

### B. Breach of Contract by Texana Bank

18.     JDJS would show that Texana breached the contract for account services by honoring checks signed by Shanna Wilbanks after February 4, 2010.  Shanna Wilbanks was removed from the Operating Account signature card on February 4, 2010.  Yet, despite her removal, she continued to write checks.    Texana did not exercise ordinary care and did not act in good faith when  it honored these checks, despite express written notification that this signature was unauthorized and instruction that no checks signed by Wilbanks be honored.  Plaintiff suffered damages as a result of the breach.  Plaintiff seeks damages resulting from the breach of contract and attorney's fees for this cause of action.

### C. Bank Does Not Receive Protection Under Tex. Bus. & Com. Code § 4.406

19.     JDJS anticipates that texana will plead a defense under Texas Business and Commerce Code Section 4.406 in response to this cause of action.  The Account Agreement states:

> STATEMENTS- You must examine your Duty to Report Unauthorized Signatures, Alterations and Forgeries – You must examine your statement of account with "reasonable promptness."  If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant acts.  As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we contributed to the loss).  The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.
>
> You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.
>
> You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in

that statement, and as between you and us the loss will be entirely yours.  This 60-day limitation is without regard to whether we used ordinary care.  The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

But,  Texana does not receive protection under this provision because  it did not exercise ordinary care and did not act in good faith when  it honored the checks.  Specifically, the Account Agreement entered into on February 4, 2010, clearly stated on page four that Shanna Wilbanks was no longer an authorized signatory on the Operating Account.  The Account Agreement also stated that two authorized signatures were required on each check.  Therefore, Texana knew that the signature of Shanna Wilbanks was unauthorized, and that the checks needed two authorized signatures in order to be honored.    Texana failed to act in good faith when it honored checks that had been signed by Shanna Wilbanks on or after February 4, 2010. Because Texana failed to act in good faith, it cannot claim protection under Section 4.406 of the Texas Business and Commerce Code or their contract provision.

## V. Count Two - RICO Violation

20.     Plaintiff hereby incorporates by reference all of the facts that have heretofore been plead.

### A. The Enterprise

21.      Stone, Lucas Ponder, Texana and Shanna Wilbanks are an association in fact Enterprise, as that term is defined in 18 U.S.C. 1961(4).

22.     These persons and entities hold themselves out as legitimate providers of banking services, and auto dealership management operations services.

23.     The Enterprise exists separate and apart from the pattern of racketeering activity alleged herein.  As referenced in the paragraphs above, Stone, Lucas Ponder and Texana associated prior to the period at issue in this lawsuit, with regard to banking services and auto dealership management operation services.  The Enterprise exists from at least 2007 to 2010.

24.     The Enterprise has an identifiable structure, with each member fulfilling a specific role to carry out and facilitate its purpose as follows:

25.     Stone established, financed, owned, operated, and/or participated in the management of automobile dealerships.  This includes:

        a.        Recruitment and training of staff, including office manager Shanna Wilbanks, to assist in embezzlement from the Operating Account of assets, opening a second,

sham operating account at Franklin Bank (the "Franklin Bank Account"), making multiple transactions to various accounts and payees for the purposes of draining the assets of the Operating Account for the financial gain of Stone, misrepresenting and falsifying of financial documents including ledgers, P&L statements, checks and check registers in an attempt to conceal the theft of money, and the signing and passing of checks without right or authority after signature cards had been changed.

b.   Coercion, chastisement or termination of staff that were unwilling to comply with Stone's directives

26.   Texana owns and operates a bank, including providing checking services and loan services.  Texana, through its Vice President, Lucas Ponder, participated in the draining of assets from the Operating Account by honoring checks which did not have signatures of authorized signatories of the Operating Account, authorizing the payment of Stone's personal obligations from the Operating Account, accepting a check for $30,000 written to "Texana Bank"and other acts.

27.   The Enterprise engages in, and its activities affect, interstate commerce.

28.   The Defendants have been employed by and/or associated with the Enterprise, have participated in the management and operation of the Enterprise, and deliberately caused a fraud to be perpetrated upon JDJS.

### B. The Purpose of the Scheme and the Association-in-fact Enterprise

29.   The purpose of the scheme and the association-in-fact enterprise was to illicitly and illegally enrich Stone and Texana at the expense of JDJS.

30.   As set forth at length above and incorporated herein, the scheme and purpose of the association-in-fact enterprise was to create fraudulent accounts, ledgers, P&L statements, make fraudulent charges on credit cards, and other acts, for the purpose of draining JDJS of assets and enriching Defendants.  Also as explained above, thee is a long-standing relationship between Stone and Ponder; they were known associates before 2007, and they began in 2007 to work in concert together to commit various acts of fraud and embezzlement which continued through 2010.

### C. The Pattern of Racketeering Activities

31.     Defendants knowingly conducted and/or participated, directly and indirectly, in the conduct of the affairs of the above described Enterprise through a "pattern of racketeering activity" as defined by 18 USC §1961(5).

32.     **Mail Fraud.** Such racketeering activity consists of repeated violations of the Federal mail fraud statute, 18 USC §1341, based upon the fraudulent transactions as described above. The elements of mail fraud are; (1) a scheme to defraud by means of false or fraudulent representation, (2) interstate or intrastate use of the mails to execute the scheme, (3) the use of the mails by the defendant connected with the scheme and (4) actual injury to the plaintiff.  *In re Burzynski*, 9898 F.2d 733, 742 (5th Cir. 1993).  Here, Stone, Wilbanks and Ponder were participating in a scheme to defraud JDJS and DeKoker of massive amounts of money for their enrichment.  For example, Stone represented that he would provide $300,000 in start up capital to JDJS.  Instead, Stone got a personal loan from Texana bank through Ponder for $300,000, which they coordinated to be paid back from the Operating Account at Texana through $3,500 automatic monthly debits.  The mails were used in execution of the scheme by the sending and receiving of the checks, debits, and statements.  Stone and Ponder embezzled $134,000 in this way.

33.     Further, on February 4, 2010, Shanna Wilbanks was removed from the signature card relating to the Operating Account, and Texana was given express written notification that Shanna Wilbanks had been removed and the bank was not to honor any checks signed by her, and that two signatures were required on the check.  Despite the fact that Shanna Wilbanks had been removed from the Operating Account, Stone coerced Wilbanks to sign 25% of the checks with him after that time.  For example, Shanna Wilbanks signed a check on or about February 23, 2010 for $30,000 from the Operating Account to a company called TSI for oil field equipment used in Stone's separate oilfield business, Stomaco.  Also, Shanna Wilbanks signed a check on March 2, 2010 to Breitling Oil and Gas for $7,000. [Chris Faulkner of Breitling Oil and Gas confirmed that he sold Stone an interest in a gas well after meeting him on a plane to Las Vegas.] The mails were used in execution of the scheme by the sending and receiving of the checks, debits, and statements.  Ponder honored the checks drafted by Shanna Wilbanks and the funds

were thus embezzled from the Operating Account.  Other acts of mail fraud are more specifically described in the Facts section of this complaint, above.

34.     **Banking Fraud.**  Such racketeering activity also consists of repeated violations of the Federal banking fraud statute, 18 USC §1344, based upon Defendants' knowing execution of a scheme to obtain  monies, funds, credits, assets or other property owned by JDJS, and under the control of Texana in its Operating Account, by means of false and fraudulent pretenses, representations and promises.  For example, Stone represented that he would provide $300,000 in start up capital to JDJS.  Instead, Stone got a personal loan from Texana bank through Ponder for $300,000, which they coordinated to be paid back from the Operating Account at Texana through $3,500 automatic monthly debits.  Stone and Ponder embezzled $134,000 in this way.  Further, on February 4, 2010, Shanna Wilbanks was removed from the signature card relating to the Operating Account, and Texana was given express written notification that Shanna Wilbanks had been removed and the bank was not to honor any checks signed by her, and that two signatures were required on the check.  Despite the fact that Shanna Wilbanks had been removed from the Operating Account, Stone coerced Wilbanks to sign 25% of the checks with him after that time. For example, Shanna Wilbanks signed a check on or about February 23, 2010 for $30,000 from the Operating Account to a company called TSI for oil field equipment used in Stone's separate oilfield business, Stomaco.  Also, Shanna Wilbanks signed a check on March 2, 2010 to Breitling Oil and Gas for $7,000. [Chris Faulkner of Breitling Oil and Gas confirmed that he sold Stone an interest in a gas well after meeting him on a plane to Las Vegas.]  Ponder honored the checks drafted by Shanna Wilbanks and the funds were thus embezzled from the Operating Account. The bank, Texana, is civilly liable to JDJS for the fraud that occurred as explained in this complaint.  Other acts of banking fraud are more specifically described in the Facts section of this complaint, above.

**D. Continued Pattern of Racketeering Activity.**

35.     These predicate acts are part of a scheme, and are not isolated events.  As explained above, there are more than two predicate acts of racketeering that are related and amount to continued criminal activity.  For example, Stone represented that he would provide $300,000 in start up capital to JDJS.  Instead, Stone got a personal loan from Texana bank through Ponder for $300,000, which they coordinated to be paid back from the Operating Account at Texana through

$3,500 automatic monthly debits.  These activities began to occur on or about May 2007.  Stone and Ponder embezzled $134,000 in this way.  Further, on February 4, 2010, Shanna Wilbanks was removed from the signature card relating to the Operating Account, and Texana was given express written notification that Shanna Wilbanks had been removed and the bank was not to honor any checks signed by her, and that two signatures were required on the check.  Despite the fact that Shanna Wilbanks had been removed from the Operating Account, Stone coerced Wilbanks to sign 25% of the checks with him after that time.  For example, Shanna Wilbanks signed a check on or about February 23, 2010 for $30,000 from the Operating Account to a company called TSI for oil field equipment used in Stone's separate oilfield business, Stomaco.  Also, Shanna Wilbanks signed a check on March 2, 2010 to Breitling Oil and Gas for $7,000.  [Chris Faulkner of Breitling Oil and Gas confirmed that he sold Stone an interest in a gas well after meeting him on a plane to Las Vegas.]  Ponder honored the checks drafted by Shanna Wilbanks and the funds were thus embezzled from the Operating Account.  Other acts constituting the pattern of racketeering activity are more specifically described in the Facts section of this complaint, above.  The period of time was substantial, totalling approximately four years, closing in 2010.

**E. Proximate Causation**

36.     A proximate causal relation exists between the RICO predicate acts and the plaintiff's damages.  For example, DeKoker relied on the express representation from Stone that Stone was bringing $300,000 into the business relationship in start up capital; when instead Stone had gotten a personal loan through Ponder of Texana Bank, and then set up an automatic withdrawal of $3,500 a month from the Operating Account, draining $134,000 from JDJS to pay back the personal loan.  Also, DeKoker relied on P&L statements provided by Stone and Wilbanks.  in an effort conceal the draining of assets from JDJS, Stone and Shanna Wilbanks made a series of entries on the last day of each month to make the P&L statements look better.  These deposits were made by Shanna Wilbanks and reversed very shortly thereafter.  The deposits were shown as being made by Warrstone and then later reversed out of the system by Shanna Wilbanks.  This practice of accounting manipulation continued to occur from July 15, 2009 to April 19, 2010.

## VI. Count Three - Conversion, Theft Liability Act and Money Had and Received

37.     Defendants are further liable for the unlawful conversion of JDJS assets that were drained from the Operating Account and stolen off of the car lot.  Plaintiff incorporates by reference all facts that have heretofore been plead in support of this cause of action.

38.     The Defendants wrongfully exercised dominion and control over the Plaintiff's property in a manner inconsistent with the Plaintiff's rights, because the Defendants took the money and property without right, title or authority.  The Defendants continue to wrongfully possess the money and property.  This conversion proximately caused JDJS's damages. Defendants' acts were of a wanton and malicious nature.

39.     Pursuant to the Theft Liability Act, Defendants are further liable for their wrongful conversion of JDJS's money and real property.  Under the Theft Liability Act, a plaintiff may recover for both money not specifically identified and real property.  Specifically, the Defendants are liable under Section 31.01(5) of the Texas Penal Code, which includes money not specifically identified.  Stone unlawfully appropriated the vehicles by retaining the title without right.  Further, Texana, without proper authorization, allowed the withdrawal and transfer of funds from the Operating Account.  JDJS sustained damages as explained more specifically below.

40.     Alternatively, JDJS is entitled to recover under the theory of money had and received.  Under this equitable doctrine, the Plaintiff may recover for unjust enrichment in circumstances where the Defendant holds money that in equity and good conscience belongs to the Plaintiff.  JDJS had ownership in that money, and Stone embezzled the funds, and Texana acted in collusion in allowing those funds to be withdrawn and transferred without authorization.  The Defendants continue to retain JDJS's money.  The conversion proximately caused damages to JDJS.

## VII. Count Four- Fraud

41.     Defendants are further liable to JDJS for fraud.  Plaintiff incorporates by reference all facts that have heretofore been plead.

42.     On February 4, 2010, Shanna Wilbanks was removed from the Operating Account signature card.  After that time, Shanna Wilbanks wrote 25% of the checks issued.  Despite the fact that Wilbanks was removed, Texana continued to honor checks signed by her in direct

violation of the Account Agreement between JDJS and Texana.  The financial services were either intentionally not performed, or were performed with reckless disregard to JDJS.

43.     Texana represented, as part of the Account Agreement, that they would honor only checks signed by authorized signatories.  Yet, after the signature card for the Operating Account was changed, Texana continued to honor checks that were signed by Shanna Wilbanks.  JDJS changed the signature card to specifically remove Shanna Wilbanks from the Operating Account and relied on Texana to provide the service of honoring checks written only by signatories to the Operating Account.  Texana misrepresented this service, failed to perform this service, or performed the same in a negligent and reckless manner, with intentional disregard to their customer.

44.     Plaintiff relied on these misrepresentations made by the Defendants to its detriment. Defendants' actions were the producing cause of the injuries and damages to the Plaintiff.

45.     The misrepresentations regarding the nature of the contract terms were made knowingly or recklessly by Texana, both orally and in writing.  The misrepresentations were made with the intent that JDJS would act upon them and execute the contract.  JDJS relied upon the misrepresentations and as a result entered into the contract.  Further, JDJS continued to rely on the misrepresentations since that time to its determent, and needlessly underwent embezzlement of its assets from its Operating Account.  JDJS suffered substantial economic injury as a result of the misrepresentation, as explained herein.  JDJS's damages are distinct from those relating to its claim for breach of contract, as explained herein and elsewhere in this Complaint.

### VIII. Count Five– Negligence and Gross Negligence

46.     Texana was negligent and grossly negligent in the administration, management and maintenance of the Operating Account.  Plaintiff incorporates by reference all facts that have heretofore been plead.

47.     Texana had a duty to maintain the Operating Account using ordinary care and breached that duty.  For example, on February 4, 2010, Shanna Wilbanks was removed from the signature card of the Operating Account.  Yet, Texana continued to honor checks signed by Shanna Wilbanks, despite Texana's specific knowledge that Shanna Wilbanks was no longer a signatory. Texana was not acting in good faith by honoring the checks signed by Shanna Wilbanks.

48.      Texana breached its duty to JDJS.  Texana failed to follow industry account maintenance practices in handling the Operating Account.  Further, Texana failed to follow internal policies regarding account maintenance practices in handling the Operating Account.   Texana failed to properly train its employees in account maintenance practices, including the determination of which checks to honor, which merely required   Texana's staff to verify that the signature on the check were authorized ones.  A simple verification of this would have revealed to Texana that Ms. Wilbanks's signature had been removed from the signature card.  Texana failed to follow quality control policies and procedures, and failed to follow, or have in place, proper "checks and balances" procedures relating to maintaining and managing accounts.

49.      Texana's breach of duty proximately caused JDJS's injury.  Texana's failure to properly manage and maintain the Operating Account was a cause in fact of JDJS' injuries.   Texana should have anticipated the danger created by its negligent acts and omissions.

50.      Texana's actions and inactions, when viewed objectively from the Defendant's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and Texana had actual, subjective awareness of the risk, but proceeded anyway with a conscious indifference to the rights, safety or welfare of  Plaintiff.  The Defendants' negligence and gross negligence proximately caused damages to JDJS.

## IX.  Count Six– Vicarious Liability

51.      Texana is further liable to Plaintiff for the acts committed by its Vice President, Lucas Ponder, and other employees and predecessors in interest.  Plaintiff incorporates by reference all facts that have heretofore been plead.   JDJS was injured as a result of acts of the Texana's employees and/or predecessors in interest, as described above.  The acts committed by the employees and/or predecessors in interest were within the actor's general authority in furtherance of Texana's business and for the accomplishment of the object for which the employee was hired.  Texana is therefore vicariously liable for the actions and inactions of its employees and predecessors in interest.

## X.  Breach of Fiduciary Duty

52.      JDJS further asserts that Stone breached his fiduciary duty towards JDJS.  Plaintiff incorporates by reference all facts that have heretofore been plead.

---

53.     Stone had a fiduciary duty to JDJS.  Corporate officers owe a fiduciary duty to the corporations they serve, and Stone, as Vice President of JDJS, had a fiduciary duty to the corporation.  As a fiduciary, Stone owed JDJS the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, which extends to dealings with a fiduciary's spouse, agents, employees and other persons whose interests are closely identified with those of the fiduciary, the duty to act with integrity of the strictest kind, the duty of fair and honest dealing, and the duty of full disclosure.  Stone breached his fiduciary duties to JDJS by embezzling massive amounts of money from JDJS and stealing vehicles from JDJS.  His breach resulted in injury to JDJS.

## XI. Tolling of Limitations/Discovery Rule

54.     JDJS further asserts that limitations under Section 4.406 of the Texas Business and Commerce Code has not barred these causes of action.  Specifically, Stone acted fraudulently in concert with others to conceal the missing funds.  Further, Texana did not act in good faith and therefore is not entitled to any defense under Section 4.406.  JDJS did not know, and in the exercise of reasonable diligence could not know, of Texana's actions and inactions resulting in injury to JDJS until that time.

## XII. Damages

55.     Plaintiff incorporates by reference all facts that have heretofore been plead.

56.     Plaintiff seeks just compensation for the loss, which is in excess of $75,000:

   a.     Damages actually sustained, known as expectancy damages, that would give the Plaintiff the benefit of its bargain, by putting the Plaintiff in as good a position as it would have been in, if the contract had been performed.

   b.     Loss of Value.  Plaintiff has sustained loss in value, including the Plaintiff's anticipated receipts under the contract.  Because the Defendant failed to perform, Plaintiff is entitled to loss in value caused by the breach that is equal to the value that full performance would have yielded for the Plaintiff.

   c.     Lost Profits and Consequential Losses.  Plaintiff has sustained lost profits and consequential losses that flow naturally, but not necessarily, from the theft and breach of contract, and were considered by the parties, at the time they made the

contract, to be a probable result of any breach, including lost profits and cost of delay in performance.

d. Pecuniary loss, including: (1) the difference between the value of what the Plaintiff has received in the transaction and the purchase price or other value given for what it received, (2) out of pocket expenses and (3) loss otherwise suffered as a consequence of the plaintiff's reliance on the misrepresentation.

e. Past and Future Mental Anguish

f. Exemplary Damages

g. Loss of Credit and Credit Reputation

h. Statutory damages

i. Pre and Post Judgment Interest, costs of court and attorney's fees

### XIII. Prayer and Jury Demand

57. Plaintiff asserts its rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

58. For these reasons, Plaintiff asks for judgment against Defendants for the above damages, and any and all additional relief that it may show itself justly entitled to, either at law or in equity.

Respectfully submitted,

**MARTIN WALKER** P.C.

522 S. Broadway, Suite 200
Tyler, Texas 75702
(903) 526-1600 Telephone
(903) 595-0796 Telefax

By: _____
John F. (Jack) Walker, III
Bar I. D. No. 00785167
E-mail:  jwalker@martinwalkerlaw.com

Marisa M. Schouten
Bar I.D. No. 24039163

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2011, a copy of the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to the Clerk of Court using the CM/ECF system.  Notice of the filing will be sent to all counsel of record by operation of the court's electronic filing system.

_____

JACK WALKER